**Opinion issued May 28, 2026**



**In The**

# Court of Appeals

**For The**

# First District of Texas

———————————

**NO. 01-25-00572-CV**

———————————

**SCI TEXAS FUNERAL SERVICES, LLC AND SCI VIRGINIA FUNERAL SERVICES, LLC, Appellants**

**V.**

**BRIAN MANN, DARRELL MANN, AND CAROLYN EANES, Appellees**

---

**On Appeal from the 270th District Court**
**Harris County, Texas**
**Trial Court Case No. 2024-86582**

---

## MEMORANDUM OPINION

Three adult siblings filed suit against two SCI-affiliated entities that own and operate funeral homes on allegations that SCI did a poor job of embalming and handling their father's body. Those allegations have not yet made it to a trier of fact

because the parties disagree about who the trier of fact should be: a jury or an arbitrator. The SCI entities asked the trial court to compel arbitration and stay the trial court proceedings, but the court denied SCI's motion. SCI appeals and argues that the trial court erred by denying the motion to compel because one of the deceased's children signed a contract that contained a valid arbitration clause and the other two children, although non-signatories to any contracts containing arbitration clauses, are nevertheless bound by the promises to arbitrate.

We reverse.

## Background

The appeal involves four contracts and five parties. Three contracts with arbitration clauses were signed in Virginia by Harvey Mann, but he died while visiting family in Texas in 2024. Mann's adult children—Brian Mann, Darrell Mann, and Carolyn Eanes—are plaintiffs here, but they did not sign the contracts that he signed. In fact, the sons did not sign a contract at all. His daughter signed a contract with an arbitration clause, but she and her brothers oppose arbitration, pointing out (1) that her signature took place after the embalming, and (2) that her brothers never signed anything.

With no trial having taken place, the basic facts have yet to be fully developed, but the parties agree that the dispute involves four contracts. We will describe the four contracts in chronological order.

2

*Contract #1.* In 2002, Harvey signed a contract with Woody Funeral Home (a funeral home owned by SCI Virginia Funeral Services) entitled Insurance-Funded Prearranged Funeral Agreement. Under this contract, Harvey purchased a life insurance policy, the proceeds of which would be used upon his death to pay for his funeral expenses. Harvey did not purchase specific goods, such as a casket, at the time he signed this contract. He did, however, purchase a "Travel Protection Plan" that would cover transportation expenses if he died away from his home in Virginia.

The contract addresses a variety of items, including embalming. It has an arbitration clause in all capital letters:

> Purchaser agrees that any claim he/she may have against seller (including the interpretation of this arbitration clause) shall be submitted to and finally resolved by mandatory and binding arbitration in accordance with the statutes, rules or regulations governing arbitrations in the state where this agreement has been executed. In the absence of such statutes, rules or regulations, the arbitration proceedings shall be conducted in accordance with the applicable rules of the American Arbitration Association ("AAA") . . . . This arbitration provision shall be binding on the purchaser as well as any other person who claims to be a third party beneficiary of this agreement.

(Emphasis omitted.) The contract also has an integration clause providing that "[a]ll of the terms and conditions of this Agreement are stated on both sides hereof." This clause provides that the contract "shall be binding upon the successors, assigns, beneficiaries, heirs and legal representatives of all the parties hereto" and that the contract "when signed, constitutes the entire Agreement between the parties."

3

Although the 2002 contract never says "third-party beneficiary," it does refer to the signatory's family, next-of-kin, or other authorized representative. For example, it states that such a survivor can, at any time, request that another funeral home provide funeral services for Harvey, and a survivor can "cancel this agreement at any time before the funeral goods and services are provided." It also allows a survivor to cancel the agreement after Harvey's death, entitling the beneficiary under the insurance policy to receive the policy's death benefits. Similarly, the insurance section of the contract contemplates a role for third-party family members; it states that the insurer may pay death claim proceeds to any relative who is responsible for the burial of the insured.

*Contract #2.* On Valentine's Day in 2013, Harvey and his wife Helen signed a contract for cemetery interment rights with another SCI affiliate (Dale Memorial Park), located in Chesterfield, Virginia.

The 2013 contract invokes the Federal Arbitration Act and calls for arbitration of "any action, dispute, claim or controversy of any kind, based on our past, present or future relationship or conduct, that is related in any way to" such things as "the interpretation, scope, or validity of the Agreement, this Arbitration Contract, or the arbitrability of any issue," and "any other aspect of your and our past, present, or future relationship or conduct." The contract contains an integration clause: "This Agreement, including the Arbitration Contract and any Retail Installment Contract,

4

reflects all of the terms and conditions and the entire agreement between you and us concerning the subject matter hereof."

Further, the 2013 contract recognizes that the purchaser might not be available for decision-making at the time of performance. So it contains a blank where someone else may be identified as having the right to consult: "Purchaser agrees that upon death of the Beneficiary, the Seller may consult with you, if available, or the following person(s) . . . ." In the blank, the parties wrote in the names of two of the plaintiffs here: "Carolyn Eanes" and "Darrell Mann."

*Contract #3*. Also on Valentine's Day in 2013, Harvey and Helen signed a statement of rules and regulations for the cemetery. The statement contains an arbitration clause calling for dispute resolution under the AAA rules in the event of a dispute between the "parties hereto," although nobody else seems to have signed the statement as a counterparty.

Another decade went by without incident. In 2023, however, Helen died, so the children became the beneficiaries of the insurance policy. Harvey died on March 6, 2024, while he was apparently visiting family in San Antonio. The ten days after his death became the most significant in the current controversy, because during those days his body was embalmed in Texas (by a funeral home owned by SCI Texas Funeral Services) and later flown back to Virginia for burial.

5

On March 7, 2024, SCI Texas emailed SCI Virginia and stated, "I can also have my PCC embalm him before his flight if you wish." SCI Virginia wrote back approvingly. SCI Texas embalmed Harvey's body on March 13. The body was flown to Atlanta on March 15 and thence to Richmond on March 16.

*Contract #4*. On March 19, 2024, Harvey's daughter Carolyn signed a contract with SCI Virginia for funeral goods and services. The contract is entitled Statement of Funeral Goods & Services Selected. Its itemized list of goods and services sets out various offerings, such as "Dressing and Casketing of Deceased," "Embalming," "Transfer of Remains to Funeral Home," and "Transfer to or From Airport," each with its own price.

This 2024 contract between SCI Virginia and Carolyn contains an arbitration provision, which states that the parties agree that any claim they may have against the other shall only be resolved through arbitration. The contract also restates the promise to arbitrate, stating that "any claim the parties may have . . . relating in any manner to the transaction, rights, goods and/or services contemplated by this agreement," shall be submitted to arbitration pursuant to the Federal Arbitration Act.

The funeral was to take place on March 23, but on the day before the funeral, the family saw the body and deemed it in unsuitable condition for an open casket service, so they went ahead with a closed funeral. A few months later, Brian, Darrell, and Carolyn sued the two SCI entities.

6

The live pleading contains allegations such as failing to properly embalm the decedent's body and failing to handle the body in a good and workmanlike manner. The petition alleges "horrifying additional decay . . . took place overnight" before the funeral service. It seeks actual damages such as "pecuniary losses," funeral expenses, and mental anguish, as well as exemplary damages for gross negligence. Pointing to the four contracts between SCI and either Harvey or Carolyn, the SCI entities moved to compel arbitration and stay the trial court proceedings. The trial court denied the motion.

The SCI entities appealed. We will treat them as a single SCI entity, because SCI Texas plainly acted as the agent for SCI Virginia.

### Denial of Motion to Compel Arbitration

SCI argues that the trial court erroneously denied its motion to compel arbitration because all the relevant contracts—including a contract signed by Carolyn—contained a valid arbitration provision. It further argues that although neither Brian nor Darrell signed a contract with SCI, they were nevertheless bound by the arbitration provisions under several legal theories.

### A. Standard of Review

A party seeking to compel arbitration must prove (1) the existence of a valid arbitration clause, and (2) the disputed claims fall within that agreement's scope. *Cerna ex rel. R.W. v. Pearland Urb. Air, LLC*, 714 S.W.3d 585, 588 (Tex. 2025).

7

Courts decide whether a valid agreement to arbitrate exists, and we may not compel arbitration absent such an agreement. *Id.* Parties can agree to delegate questions of an arbitration provision's scope to the arbitrator. *Id.* at 589. We will enforce delegation provisions if the parties clearly and unmistakably delegated scope questions to the arbitrator, such as by agreeing to arbitrate in accordance with the AAA rules. *Id.*; *TotalEnergies E&P USA, Inc. v. MP Gulf of Mex., LLC*, 667 S.W.3d 694, 712 (Tex. 2023).

We review a trial court's order denying a motion to compel arbitration for an abuse of discretion. *Henry v. Cash Biz, LP*, 551 S.W.3d 111, 115 (Tex. 2018). Under this standard, we defer to a trial court's factual determinations if supported by evidence, but we review the court's legal determinations de novo. *In re Labatt Food Serv., L.P.*, 279 S.W.3d 640, 643 (Tex. 2009) (orig. proceeding). "Gateway" questions of arbitrability, such as whether a valid arbitration agreement exists and whether an arbitration agreement is binding on a non-signatory, are questions of law that we review de novo. *Lennar Homes of Tex. Land & Constr., Ltd. v. Whiteley*, 672 S.W.3d 367, 376 (Tex. 2023).

B.      **Carolyn Promised to Arbitrate in the 2024 Contract and Must Keep That Promise**

Harvey's daughter Carolyn signed the 2024 contract and became bound as a signatory. The 2024 contract undeniably requires arbitration. In that contract, the parties agree that "any claim they may have against the other shall only be resolved

through arbitration." In a more detailed arbitration provision later in the contract, the parties agree that "any claim the parties may have . . . relating in any manner to the transaction, rights, goods and/or services contemplated by this agreement . . . shall be submitted to and finally resolved by mandatory and binding arbitration pursuant to the Federal Arbitration Act." The parties also agree that "JAMS rules will govern the arbitration." Further, the parties agree that the arbitration provision "applies to any claim or dispute between or among the purchaser, any person who claims to be your family member or a third party beneficiary of this agreement, the seller . . . [and] any of the seller's parent, subsidiary, or affiliate corporations . . . ." This promise suffices to require Carolyn to arbitrate.

In arguing that the trial court properly denied SCI's motion to compel, the Manns advance several arguments for why the arbitration provision in the 2024 contract is unenforceable. We now turn to these arguments.

### 1. The 2024 arbitration agreement is not illusory

The Manns first contend that the promise to arbitrate is illusory and therefore unenforceable. They see the promise as a one-way street, in that it provides notice that SCI might have to pursue collection, which could require the use of the courts.[1]

---

[1] The 2024 contract includes provisions stating that SCI, by signing the contract, has not "waived any rights to file a claim in the estate of the Deceased"; SCI "can take action against you to collect amounts due under this Agreement"; SCI can refer the agreement to an attorney or a third-party collection agency for collection and

In their view, this prospect of a collection action in court means a lopsided bargain, where only one side has to go to arbitration.

This argument fails. The 2024 contract contains more than merely a single promise running only one way. *See Masterson v. SCI Tex. Funeral Servs., LLC*, No. 01-23-00496-CV, 2025 WL 2165176, at *10 (Tex. App.—Houston [1st Dist.] July 31, 2025, no pet.) (mem. op.) ("While the arbitration agreements lack mutuality, the 2019 and 2021 contracts were supported by valid consideration in the form of mutual, binding promises. Masterson agreed to pay SCI and to arbitrate claims, in exchange for SCI's corresponding promises to provide goods, services, and legal authorization for her to inter her father's remains and place a bench near his grave."). The various promises between the parties provide more than enough consideration to make the promises enforceable, including the promise to arbitrate. *Id.*; *see Royston, Rayzor, Vickery, & Williams, LLP v. Lopez*, 467 S.W.3d 494, 505 (Tex. 2015) (stating that arbitration provision "that is part of a larger underlying contract may be supported by the consideration supporting the underlying contract" and that "the mere fact that an arbitration clause is one-sided does not make it illusory"); *In re AdvancePCS Health L.P.*, 172 S.W.3d 603, 607 (Tex. 2005) (orig. proceeding) (per curiam).

enforcement; and if SCI refers the matter for collection, Carolyn "agree[s] to pay all reasonable costs of collection to the extent permitted by law, including court costs."

As for the contractual reference to court costs, that clause is entirely consistent with a promise to arbitrate. It merely gives notice to consumers that there might be consequences for falling into delinquency on a debt. It does not create a tilted scheme in which the arbitration requirement applies only to the consumer.

The Manns argue that this kind of warning about exposure to court costs invalidated an arbitration clause in *SCI Texas Funeral Services, Inc. v. Leal*, No. 13-09-00050-CV, 2009 WL 332043 (Tex. App.—Corpus Christi–Edinburg Feb. 12, 2009, no pet.) (mem. op.) (per curiam). The *Leal* decision does not persuade us. First, the court that decided *Leal* has largely limited the decision to its unusual facts.[2] *See Serv. Corp. Int'l v. Ruiz*, No. 13-16-00699-CV, 2018 WL 549196, at *6 (Tex. App.—Corpus Christi–Edinburg Jan. 25, 2018, pet. denied) (mem. op.). Second,

[2] The arbitration provision in *Leal* began by stating that the "*purchaser* agrees that any claim *he/she may have against seller* . . . shall be submitted to and finally resolved by mandatory and binding arbitration . . . ." *SCI Tex. Funeral Servs., Inc. v. Leal*, No. 13-09-00050-CV, 2009 WL 332043, at *5 (Tex. App.—Corpus Christi–Edinburg Feb. 12, 2009, no pet.) (mem. op.) (per curiam) (emphasis added). The arbitration provision in the 2024 contract is not so limited: "Any claim *the parties* may have . . . relating in any manner to the transaction, rights, goods and/or services contemplated by this agreement" shall be submitted to arbitration. (Emphasis added.) The 2024 contract includes another reference to arbitration directly above Carolyn's signature which states that "the parties agree that *any claim they may have against the other* shall only be resolved through arbitration . . . ." (Emphasis added.) These provisions contemplate that both Carolyn's complaints against SCI *and* SCI's complaints against Carolyn shall be resolved through the arbitration process.

Moreover, the contract in *Leal* included a provision in which the funeral home reserved the right to cancel the agreement "at any time it finds itself unable to fulfill this Agreement or perform any service or make any interment" due to several listed circumstances, including "any other unforeseen contingency" or "because of any mistake[.]" *Id.* at *6. The 2024 contract does not contain a comparable provision.

11

regardless of what one may say about *Leal*, the supreme court's decision in *Royston Rayzor* and our decision in *Masterson* leave no room for the position advanced by the Manns here. We conclude that the 2024 contract's arbitration provision is not illusory.

**2.      The date of the alleged breach does not alter the duty to arbitrate**

In another argument against the promise to arbitrate, the Manns contend that all the alleged wrongdoing occurred before Carolyn signed the contract on March 19, 2024. In their view, any claim for negligence accrued before the date of the 2024 contract and thus falls outside its scope. Their argument is unpersuasive.

First, the argument's premise looks questionable. Given this record, nobody can say with any assurance what took place when. The record indicates that embalming took place in Texas on March 13, air travel on March 15–16, and the first family viewing of the body on March 22. But nothing in that timeline tells us when any breaches took place. The Manns' petition alleges that they were "greeted with a severely decomposed body" at the viewing, but it also complains that after the viewing there was "additional decay that took place overnight."

Second, and in any event, the precise date of any breach does not make any legal difference. The contract says that the parties agree to arbitrate "any claim they may have against the other." That agreement covers the claims asserted in this suit regardless of when the claims accrued or when any breach occurred.

12

For all these reasons, Carolyn has an obligation to arbitrate her claims. This obligation arises because she signed a contract promising that she would. The remaining issue in the appeal becomes whether the obligation to arbitrate extends to her brothers, who did not sign such a contract.

## C. Brian and Darrell Also Have an Obligation to Arbitrate

Brian and Darrell signed no contract, but that fact alone does not control whether they have an obligation to arbitrate. Rather, it furnishes a starting point. We begin from the proposition that arbitration is a matter of contract. *See TotalEnergies*, 667 S.W.3d at 701 (stating that arbitration is "a matter of consent, not coercion" and therefore parties "cannot be compelled to arbitrate any controversy unless they have contractually agreed to do so") (quotation omitted). As a result, a contract normally does not bind non-parties: "Generally, only signatories to an arbitration agreement are bound by the agreement." *Elgohary v. Herrera*, 405 S.W.3d 785, 789–90 (Tex. App.—Houston [1st Dist.] 2013, no pet.) (quotation omitted).

Sometimes, however, a non-signatory can be bound to arbitrate under a contract he did not sign. *Lennar Homes*, 672 S.W.3d at 376; *Jody James Farms, JV v. Altman Grp., Inc.*, 547 S.W.3d 624, 633 (Tex. 2018). Applying "common principles of contract and agency law," Texas courts have recognized six legal theories that may bind a non-signatory to an arbitration agreement: (1) incorporation by reference; (2) assumption; (3) agency; (4) alter ego; (5) equitable estoppel; and

13

(6) third-party beneficiary. *Lennar Homes*, 672 S.W.3d at 376 (quotation omitted); *Rodeo Res., Inc. v. RSM Prod. Corp.*, No. 01-24-00119-CV, 2026 WL 59734, at *6 (Tex. App.—Houston [1st Dist.] Jan. 8, 2026, no pet.) (mem. op.); *see In re Weekley Homes, L.P.*, 180 S.W.3d 127, 129 (Tex. 2005) (orig. proceeding) ("[N]onparties may be bound to an arbitration clause when the rules of law or equity would bind them to the contract generally."). SCI relies on the first, fifth, and sixth items on this list to argue that Brian and Darrell should be bound by Harvey's or Carolyn's promises to arbitrate.

Before we address these arguments by SCI, we must first address Brian and Darrell's contention that the agreements signed by Harvey are also illusory. They argue that the 2002 contract is illusory because it obligates Harvey to arbitrate his claims against SCI but does not require SCI to arbitrate any claims it might have against Harvey. They further argue that the 2013 contracts are illusory because the purchase agreement grants SCI the unilateral right to terminate the contract if it is unable to perform for any reason, including an "unforeseen contingency" or a "mistake," and the cemetery rules allow SCI to change the rules and regulations without notice.

We conclude that the 2002 contract is not illusory for the same reason we concluded the 2024 contract signed by Carolyn is not illusory: the 2002 contract includes provisions binding both Harvey and SCI, and these contractual obligations

14

provide consideration for the arbitration agreement. *See Masterson*, 2025 WL 2165176, at \*10. Moreover, the fact that the arbitration provision in the 2002 contract is asymmetric and only requires arbitration of Harvey's claims against SCI does not make the provision illusory. *See Royston, Rayzor*, 467 S.W.3d at 505.

We now turn to the bases SCI advances for why Brian and Darrell, as non-signatories, are bound to arbitrate.[3]

### 1.      Incorporation by reference

The first ground is incorporation by reference. SCI contends that "Texas law permits *people* to be incorporated by reference and required to arbitrate." The Manns respond that while parties can incorporate a document into an agreement, they cannot do so with a human being: "[N]o Texas authority provides that a non-party to a contract may be 'incorporated by reference' into a contract and bound by its terms."

We are familiar with the idea of incorporating a document, but not with the idea of incorporating a party or legal entity. If Groucho and Chico sign a contract containing an arbitration provision, they normally lack the ability to require Harpo and Zeppo to go to arbitration simply by declaring it.

---

[3]      Because we conclude that the 2002 contract is not illusory and that Brian and Darrell are bound to arbitrate under that contract, we do not address their argument that the 2013 contract is illusory.

Even if they insert the extra names or explicitly state that all the brothers agree to arbitration, that does not ipso facto make it so. *See Cappadonna Elec. Mgmt. v. Cameron Cnty.*, 180 S.W.3d 364, 373 (Tex. App.—Corpus Christi–Edinburg 2005, no pet.) ("The incorporation by reference doctrine applies when a party incorporates a document by reference into its own contract and thereby binds *itself* to provisions within the incorporated document."); *see also In re 24R, Inc.*, 324 S.W.3d 564, 567 (Tex. 2010) (orig. proceeding) (per curiam) ("Documents incorporated into a contract by reference become part of that contract."). Therefore, we will focus our attention on the remaining two legal theories, equitable estoppel and third-party beneficiary.

### 2.     Direct-benefits estoppel

This species of equitable estoppel arises from the notion of not being able to have it both ways: courts will not let someone pick and choose among different aspects of the deal. The supreme court recently relied on estoppel as a basis for requiring non-signatory family members to arbitrate claims relating to construction of their home. *See Taylor Morrison of Tex., Inc. v. Ha*, 660 S.W.3d 529 (Tex. 2023) (per curiam). The court explained that under this theory, a non-signatory plaintiff seeking the benefits of a contract is estopped from simultaneously attempting to avoid the contract's burdens, such as the obligation to arbitrate disputes. *Id.* at 533;

16

*In re Weekley Homes*, 180 S.W.3d at 135 ("A nonparty cannot both have his contract and defeat it too.").

A non-signatory can seek the benefits of a contract either by suing based on the contract or by conduct that deliberately seeks and obtains substantial benefits from the contract itself. *Taylor Morrison*, 660 S.W.3d at 533. The non-signatory's claim must depend on the existence of the contract such that the claim is unable to stand independently without the contract. *Lennar Homes*, 672 S.W.3d at 377; *Rodeo Res.*, 2026 WL 59734, at \*6. This standard is not met when liability for a claim arises solely from general obligations imposed by law, such as statutory, tort, or common-law duties. *Rodeo Res.*, 2026 WL 59734, at \*6. Instead, liability must arise solely from the contract or be determined by reference to it. *Id.* If the party's right to recover and its damages depend on an agreement with an arbitration clause, the party is relying on the agreement for its claims. *Id.* If a non-signatory seeks the benefits of a contract with an arbitration clause, then the non-signatory must arbitrate all claims that fall within the scope of that arbitration clause. *Taylor Morrison*, 660 S.W.3d at 533.

Furthermore, the supreme court's analysis in *Taylor Morrison* takes into account the "special nature" of the relationship between parents and children:

> [W]hen a family unit resides in a home and sues for factually intertwined construction-defect claims concerning that home, a nonsignatory spouse and minor children have accepted direct benefits under the signatory spouse's purchase agreement such that they may be

compelled to arbitrate through direct-benefits estoppel. This is especially true given the special nature of marital and parent-child relationships.

*Id.* at 531.

Although *Taylor Morrison* dealt with minor children and a parent's duty to provide for them, the "special nature" of the relationship has just as much salience later when the decision-making must necessarily come from the younger generation. *See id.* at 534 ("The parent-child relationship also carries important weight in the arbitration context."). Under the policy rationale of *Taylor Morrison*, the "special nature" of the relationship persists into the context of burying a family member.

The Manns received benefits from the agreements that their parents signed. Those benefits include transportation and the embalming services that lie at the heart of the Manns' complaints.[4] Embalming is purely contractual, under a licensing scheme set forth in Chapter 651 of the Occupations Code. *See* TEX. OCC. CODE §§ 651.251–.658 (licensing requirements); *see also* 7 TEX. ADMIN. CODE §§ 25.1–26.12 (Tex. Dep't of Banking, Prepaid Funeral Contracts, and Perpetual Care Cemeteries) (adopting rules and regulations relating to prepaid funeral contracts and perpetual care cemeteries); 22 TEX. ADMIN. CODE §§ 201.1–209.1 (adopting rules and regulations of Texas Funeral Service Commission). Chapter 651 is entitled

---

[4]     The 2024 contract that Carolyn signed also includes embalming and transfer of Harvey's remains on its list of "Itemized Goods and Services."

18

Crematory Services, Funeral Directing, and Embalming. Without getting into details of the licensing scheme, we can safely say that the law prohibits embalming by anyone other than a licensed embalmer. *See* TEX. OCC. CODE § 651.251(b). The contractual promise to provide transportation and embalming services goes hand in hand with the promise to arbitrate.

Moreover, Brian and Darrell seek damages that depend upon the existence of Harvey's and Carolyn's contracts with SCI: "pecuniary losses" and funeral expenses. "When a party's right to recover and its damages depend on the agreement containing the arbitration provision, the party is relying on the agreement for its claims." *Meyer v. WMCO-GP, LLC*, 211 S.W.3d 302, 307 (Tex. 2006); *Rodeo Res.*, 2026 WL 59734, at *7–8 (concluding that direct-benefits estoppel applied because plaintiff's claims and damages it sought depended upon existence of three contracts with arbitration clauses).

We acknowledge the Manns' argument that providers like SCI have common-law tort obligations, which exist without any need for a contract. That assertion is true as far as it goes. *See, e.g.*, *SCI Tex. Funeral Servs., Inc. v. Nelson*, 540 S.W.3d 539, 546, 547–48 (Tex. 2018) (holding that "negligent mishandling of a corpse" is legal duty for which mental anguish damages may be available, and although Texas law requires "a special relationship" as basis for such damages, that relationship need not be contractual). But those common-law tort obligations do not extend to

embalming a body or flying it 1,500 miles across the country. The Manns' petition complains about the embalming, but embalming would not have happened at all absent a contract. The pleading does not complain or refer to transportation as such, but it does complain about failure to "handle Decedent's body in a good and workmanlike manner." The handling of the body encompasses whatever took place during the transportation from Texas to Virginia, and for all we know from this record, things may have gone wrong over the two days of transportation. At a minimum, the suit about the embalming estops Brian and Darrell from denying the duty to arbitrate, for essentially the reasons given in *Taylor Morrison*. *See* 660 S.W.3d at 533 ("Under direct benefits estoppel, a non-signatory plaintiff seeking the benefits of a contract is estopped from simultaneously attempting to avoid the contract's burdens, such as the obligation to arbitrate disputes.") (quotation omitted).

### 3. Third-party beneficiary

The final item on the list of bases for requiring a non-signatory to go to arbitration is status as a third-party beneficiary. This basis has come up before in funeral cases. In *SCI Texas Funeral Services., LLC v. Gonzalez*, No. 13-21-00453-CV, 2023 WL 3637979 (Tex. App.—Corpus Christi–Edinburg May 25, 2023, no pet.) (mem. op.), and in *SCI Texas Funeral Services, L.L.C. v. Montoya*, No. 13-19-00088-CV, 2020 WL 5582367 (Tex. App.—Corpus Christi–Edinburg Sept. 17,

20

2020, no pet.) (mem. op.), the trial court refused to order arbitration, but the appellate court disagreed and ordered arbitration because of third-party beneficiary status.

*Gonzalez* pointed to contractual language that closely resembles the contractual language in this case:

> The contract at issue states that the agreement to arbitrate "applies to any claim or dispute between or among . . . any person who claims to be a third party beneficiary of this agreement." While appellees were not signatories to the contract, it has been held that contracts for funeral services can be intended for the benefit of immediate family members of the deceased. *See Serv. Corp. Intern. v. Aragon*, 268 S.W.3d 112, 117 (Tex. App.—Eastland 2008, pet. denied) (finding that it was reasonable to conclude that interment services were intended for the benefit of the deceased's immediate family (citing *Clark v. Smith*, 494 S.W.2d 192 (Tex. App.—Dallas 1973, writ ref'd n.r.e.)); *see also Montoya*, 2020 WL 5582367, at *6. Here, appellees are all immediate family members of the deceased. *See Aragon*, 268 S.W.3d at 117. Accordingly, we find that the appellees were intended to receive a benefit through the contract. Therefore, a valid arbitration agreement exists.

2023 WL 3637979, at *4. The family members in *Gonzalez* advanced a complaint like the allegations here, namely that a poor job was done in embalming and handling the decedent's body. *Id.* at *5. All those facts led the Corpus Christi Court to conclude that the case needed to go to arbitration. *Id.*

A few months after *Gonzalez*, the Corpus Christi Court reiterated this conclusion in another case involving SCI. Hearkening back to its *Gonzalez* opinion, the court explained why the same result needed to be reached:

> The facts now before us necessitate the same outcome. The contract here authorized the funeral home "to prepare and care for the body of

[Maria] . . . and to conduct the funeral and services . . . listed in said Agreement." The factual allegations in the live pleading exclusively concern appellant's handling of Maria's remains in preparation for the funeral services and execution of said services, specifically alleging as follows:

> a. [Appellant] fail[ed] to provide a proper viewing of [Maria];
>
> b. [Appellant] fail[ed] to properly refrigerate [Maria] so as to avoid a foul smell emitting from [Maria] at the time of the funeral services;
>
> c. [Appellant] fail[ed] to properly care for [Maria's] body, as would a person using ordinary care under the same or similar circumstances;
>
> d. [Appellant] fail[ed] to exercise due care in [Maria's] refrigeration;
>
> e. [Appellant] fail[ed] to give [appellee] ample time to visit with [Maria] at the viewing . . . .

In other words, the live pleading sets forth allegations which are "inextricably enmeshed" or "factually intertwined" with the underlying contract which provided for how Maria's body would be prepared for viewing and stored.

*SCI Tex. Funeral Servs., LLC v. Hollenbeck*, No. 13-23-00042-CV, 2023 WL 6886124, at *3–4 (Tex. App.—Corpus Christi–Edinburg Oct. 19, 2023, no pet.) (mem. op.).

Under these decisions, Harvey Mann's contracts from 2002 and 2013 suffice to require arbitration on the part of his adult children if they wish to complain about the way SCI performed the services listed in those contracts. The 2002 contract, entitled Insurance-Funded Prearranged Funeral Agreement, refers to such persons

22

and to embalming. It looks ahead to future dealings between SCI and the purchaser or the purchaser's "family, next-of-kin or authorized representative." For example, it allows such third parties to "elect to cancel this Agreement."

Treating family members as third-party beneficiaries fits with the traditional view that family members occupy a special relationship with those who handle the body of the loved one. *See Nelson*, 540 S.W.3d at 547 ("The relationship between a person disposing of a decedent's remains and the next of kin is special, even without a contract."). That relationship can also be seen in Health and Safety Code section 711.002, governing "Disposition of Remains; Duty to Inter." As *Nelson* noted, "Section 711.002(a) of the Texas Health and Safety Code prescribes who has the right to control the disposition of a decedent's remains." *Id.* at 541. This law also burdens such family members with a duty to inter the body and to pay for the cost of doing so. *See* TEX. HEALTH & SAFETY CODE § 711.002(a), (a-3).

A statute may inform the analysis of someone's third-party beneficiary status. *See Dairyland Cnty. Mut. Ins. Co. of Tex. v. Childress*, 650 S.W.2d 770, 775–76 (Tex. 1983) (finding third-party beneficiary status: "the statutory obligation holding an insured liable for damages in automobile accidents also makes claimants for such damages the intended beneficiaries of an insurance policy purchased to satisfy the statutory requirement"). Given the language of the 2002 contract and the statutory duty under Section 711.002, we find the holdings in *Gonzalez* and *Hollenbeck*

23

persuasive as a basis for concluding that Brian and Darrell are third-party beneficiaries of the 2002 contract and are bound by its arbitration provision.

**D.     All Claims Are Interconnected and Fall Within the Scope of the Arbitration Provisions**

Having concluded that Carolyn is bound by the arbitration provision in the 2024 contract that she signed and that Brian and Darrell are bound by the 2002 contract's arbitration provision under direct-benefits estoppel and as third-party beneficiaries, we now must consider whether the claims fall within the scope of the arbitration provisions. We conclude that they do.

When a valid arbitration agreement is established, a strong presumption arises in favor of arbitration. *Rodeo Res.*, 2026 WL 59734, at *8. Courts should resolve any doubts as to an arbitration agreement's scope in favor of arbitration. *Ellis v. Schlimmer*, 337 S.W.3d 860, 862 (Tex. 2011) (per curiam); *Rodeo Res.*, 2026 WL 59734, at *8. "The policy in favor of enforcing arbitration agreements is so compelling that a court should not deny arbitration unless it can be said with positive assurance that an arbitration clause is not susceptible of an interpretation which would cover the dispute at issue." *Prudential Sec. Inc. v. Marshall*, 909 S.W.2d 896, 899 (Tex. 1995) (orig. proceeding) (per curiam) (emphasis and quotation omitted).

When determining whether claims fall within an arbitration agreement's scope, we focus on the plaintiff's factual allegations rather than the legal claims asserted. *In re FirstMerit Bank, N.A.*, 52 S.W.3d 749, 754 (Tex. 2001) (orig.

24

proceeding). "If the facts alleged touch matters, have a significant relationship to, are inextricably enmeshed with, or are factually intertwined with the contract containing the arbitration agreement, then the claim is arbitrable." *See SpawGlass Civ. Constr., Inc. v. Hanover Ins. Co.*, No. 01-23-00829-CV, 2024 WL 3503078, at *11 (Tex. App.—Houston [1st Dist.] July 23, 2024, pet. dism'd) (mem. op.) (quotation omitted); *Houston NFL Holding L.P. v. Ryans*, 581 S.W.3d 900, 907 (Tex. App.—Houston [1st Dist.] 2019, pet. denied) (same). A claim is not subject to arbitration "only if the facts alleged in support of the claim are completely independent of the contract and the claim could be maintained without reference to the contract." *SpawGlass Civ. Constr.*, 2024 WL 3503078, at *11 (quotation omitted); *see also In re Weekley Homes*, 180 S.W.3d at 132 ("If they pursue a claim 'on the contract,' then they must pursue all claims—tort and contract—in arbitration."); *Jack B. Anglin Co. v. Tipps*, 842 S.W.2d 266, 271 (Tex. 1992) (orig. proceeding) (concluding that DTPA claim was factually intertwined with contract claim and thus subject to arbitration clause).

The Manns' claims exist because Harvey (and Carolyn) signed contracts with SCI. Those contracts contain broad arbitration provisions. The 2002 contract requires Harvey to submit "any claim he/she may have against seller" to arbitration. The 2024 contract requires Carolyn and SCI Virginia to submit "any claim the parties may have . . . relating in any manner to the transaction, rights, goods and/or

25

services contemplated by this agreement" to arbitration. We hold that the Manns' claims fall within the scope of the arbitration clauses, and therefore the trial court erred by denying SCI's motion to compel arbitration and stay the trial court proceedings. *See Serv. Corp. Int'l v. Lopez*, 162 S.W.3d 801, 811 (Tex. App.—Corpus Christi–Edinburg 2005, orig. proceeding) (concluding that plaintiff's claims that funeral home, among other things, failed to properly prepare deceased for viewing and failed to properly store deceased's body fell within "broad arbitration clause" requiring purchaser of funeral services to arbitrate "any claim you may have" against funeral home).

## Conclusion

We reverse the order denying SCI's motion to compel arbitration. We direct the trial court to enter an order compelling arbitration and staying the trial court proceeding pending completion of the arbitration.



David Gunn
Justice

Panel consists of Justices Gunn, Caughey, and Morgan.

26